UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN BOARD OF MEDICAL SPECIALTIES, <br><br> Defendant. | Case No. 14-cv-02705 <br><br> Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

Plaintiff Association of American Physicians & Surgeons, Inc. ("AAPS") sued Defendant American Board of Medical Specialties ("ABMS") regarding ABMS's Maintenance of Certification ("MOC") program for physicians. Originally, AAPS brought a claim for restraint of trade under Section 1 of the Sherman Act and a negligent misrepresentation claim. ABMS moved to dismiss AAPS's complaint. The court granted the motion with leave to amend. [48]. AAPS filed an amended complaint reasserting the restraint of trade claim under the Sherman Act and asserting, instead of negligent misrepresentation, a claim under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. [49]. ABMS moved to dismiss the amended complaint under Rule 12(b)(6). [51]. The motion is granted.

## BACKGROUND

The court assumes familiarity with Judge Wood's opinion dismissing the original complaint, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-cv-02705, 2017 WL 6821094 (N.D. Ill. Dec. 13, 2017), and the decision of the U.S. District Court for the District of New Jersey transferring this action to this district pursuant to 28 U.S.C. § 1406(a), *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. Civ. A. 13-2609 PGS, 2014 WL 1334260 (D.N.J. Apr. 2, 2014).

In considering a Rule 12(b)(6) motion, "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013). "The facts are set forth as favorably to [the plaintiff] as those materials allow. . . . In setting forth those facts at the pleading stage, the court does not vouch for their accuracy."

*McWilliams v. Cook Cty.*, No. 15-cv-00053, 2018 WL 3970145, at *1 (N.D. Ill. Aug. 20, 2018) (citations omitted).

The amended complaint alleges as follows. Plaintiff, AAPS (again, the Association of American Physicians & Surgeons, Inc.), is a nonprofit membership organization of physicians in virtually all specialties. Am. Compl., [49] at 3 ¶ 7.[1] Defendant, ABMS (again, the American Board of Medical Specialties), is a nonprofit entity headquartered in Chicago, Illinois. [49] at 3 ¶ 8.

ABMS offers a voluntary certification program for physicians that is "not required to be licensed to practice medicine." [48] at 2. Certification does not last for life; to remain certified, physicians must participate in a "recertification" program known as "ABMS Maintenance of Certification®" ("MOC"). [48] at 2; [49] at 5 ¶ 13.

According to the complaint, ABMS has conspired with three types of entities to impose ABMS's MOC program on physicians: (1) 24 separate corporations known as "specialty boards," (2) health insurers, and (3) hospitals. [49] at 5–8 ¶¶ 13–31.

The 24 specialty boards (which are not defendants) are member medical boards of ABMS that relate to particular medical specialties. *Ass'n of Am. Physicians & Surgeons*, 2014 WL 1334260, at *1. Examples include the American Board of Allergy and Immunology, the American Board of Anesthesiology, the American Board of Colon and Rectal Surgery, the American Board of Dermatology, and the American Board of Emergency Medicine. [49] at 5 ¶ 14. The complaint alleges that ABMS and its member medical specialty boards "have conspired to impose" the MOC program on all physicians who hold an M.D. degree, "with arbitrary exemptions for older physicians." [49] at 5 ¶ 15.

As to health insurers and hospitals (which also are not defendants), the complaint alleges that ABMS "has conspired with health insurers and hospitals to require physicians to purchase the ABMS MOC® product as a condition of being in health plan networks or having medical staff privileges, respectively." [49] at 5–6 ¶ 16.

With respect to health insurers specifically, the complaint alleges that "ABMS has conspired with health insurers having market power, in order to compel physicians to purchase the ABMS MOC® product." [49] at 6 ¶ 18. The complaint alleges that "[f]or example, Defendant ABMS publicly admits that it encouraged and obtained a commitment by the Blue Cross and Blue Shield Association ('BCBSA') to require physicians to purchase and participate in ABMS MOC® as a condition of physicians being in-network with health insurance plans, causing "Blue

---

[1] Bracketed numbers refer to entries on the district court docket and are followed by the page and / or paragraph number. Page number citations refer to the ECF page number.

2

Cross and Blue Shield-affiliated health plans in multiple states," such as Blue Cross and Blue Shield of Massachusetts and Independence Blue Cross of Pennsylvania, to impose such a requirement. [49] at 6 ¶¶ 19–22. The complaint alleges that "[i]n addition, Defendant ABMS has colluded with other groups to induce health insurers to 'use Board Certification by an ABMS Member Board as an essential tool to assess physician credentials within a given medical specialty.'" [49] at 6 ¶ 23 (footnote omitted). Ultimately, "[m]ost health insurers, particularly in metropolitan areas, require that physicians purchase and comply with Defendant's ABMS MOC® product as a condition of being in-network with the insurer." [49] at 7 ¶ 24.

As for hospitals, the complaint alleges that "Defendant ABMS has sought and obtained agreement by hospitals having market power, in order to enforce Defendant's ABMS MOC® product as a condition of holding medical staff privileges." [49] at 7 ¶ 25. According to the complaint, the American Hospital Association ("AHA"), a trade association representing nearly all hospitals in the United States, is an associate member of ABMS and has agreed with ABMS to impose the MOC program on physicians. [49] at 7 ¶ 26. Further, the complaint alleges, "In Defendant ABMS's 'Portfolio Program™,' ABMS explains its campaign to induce hospitals to impose the ABMS MOC® product as a condition of holding medical staff privileges," and "ABMS requires of hospitals as a condition of joining its Portfolio Program™ that the hospital agree and represent that it has 'a willingness to commit necessary resources and consider MOC a requirement for medical staff privileges for eligible physicians.'" [49] at 7–8 ¶¶ 27–28 & n.6.[2] Approximately 80% of hospitals nationwide now require physicians to have ABMS certification to be on the medical staff. [49] at 8 ¶ 31. Within that group of hospitals, outside of Texas and Oklahoma (which as discussed below have enacted laws regarding MOC), nearly all now require that physicians purchase the MOC program to have medical staff privileges. [49] at 8 ¶ 31.

ABMS's MOC program has affected the practice of individual doctors. An AAPS physician member identified as "J.E.," who had been on the staff of the Somerset Medical Center in Somerville, New Jersey for twenty-nine years, chose not to participate in the MOC program. [49] at 9 ¶¶ 34–36. In 2011, the Somerset Medical Center refused to allow J.E. to continue to remain on its medical staff unless he purchased and complied with MOC. [49] at 9 ¶ 35. J.E. had been fully certified in good standing with a predecessor to one of the specialty boards. [49] at 9 ¶ 37. Effective June 24, 2011, the Somerset Medical Center excluded J.E. from its medical staff due to ABMS's activities and agreements to impose the MOC program. [49] at 9 ¶ 39. J.E., like many other AAPS physicians, spends a substantial percentage of his time providing charity care to patients who would not otherwise have access to medical care. [49] at 9 ¶ 40. The complaint explains that "J.E.

---

[2] The complaint cites the December 2016 Standards and Guidelines for Program Sponsorship for ABMS's Portfolio Program, [49] at 8 n.6, but does not describe the features or function of the program.

manages and works in a standalone medical charity clinic for a substantial part of each week." [49] at 10 ¶ 49. "J.E. continued to serve his non-hospitalized charity patients rather than comply with the immense burdens of recertification demanded by Defendant's agreements to implement ABMS MOC®." [49] at 10–11 ¶ 52. Such patients are "denied the benefit of being evaluated and treated by J.E. when taken by emergency to [Somerset Medical Center]." [49] at 9 ¶ 41.

Physicians spend more time in training than most other professionals. [49] at 10 ¶ 45. The "additional burdens on physicians' time imposed by the [MOC] product is substantial, often exceeding 100 hours per year." [49] at 10 ¶ 46. For an average physician "that time burden takes the physician's ability away from more than 700 patient visits per year." [49] at 10 ¶ 47. ABMS has entered into agreements with many of the specialty boards to impose even greater time and expense burdens. [49] at 11 ¶ 53. According to the complaint, the MOC program imposes greater burdens than any analogous program in any other profession. [49] at 11 ¶ 56.

Every state has one or more official medical board authorized by law and accountable to the public that is responsible for determining physicians' fitness to practice medicine. [49] at 12 ¶ 59. ABMS is not a state medical board or other state entity, but a nonprofit organization. None of the state medical boards require purchase of or participation in MOC. [49] at 12 ¶ 59. Several states, including Texas and Oklahoma, have enacted laws prohibiting the imposition of MOC as a requirement for physicians in various contexts. [49] at ¶ 60.

AAPS first brought this complaint in the District of New Jersey, alleging (1) a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and (2) negligent misrepresentation. [1]. The court transferred the case to the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a). [22]; *Ass'n of Am. Physicians & Surgeons*, 2014 WL 1334260.

ABMS moved to dismiss the complaint. [30]. The court granted ABMS's motion. [48]; *Ass'n of Am. Physicians & Surgeons*, 2017 WL 6821094. The court held that the complaint did not plausibly allege: (1) for purposes of the Sherman Act claim, an unreasonable restraint of trade (under either the *per se* rule or the rule of reason) or antitrust injury; or (2) with respect to the negligent misrepresentation claim, any false statement of fact by ABMS. [48]. The court granted AAPS leave to amend.

AAPS then filed this two-count amended complaint, (1) again bringing a claim under Section 1 of the Sherman Act and (2) instead of negligent misrepresentation, bringing a claim under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. [49]. AAPS seeks to represent the interests of its members. [49] at 4–5 ¶ 12. It also seeks to bring claims on behalf of a class defined as "all physicians in private practice who are in-network or seek to be in-network

4

with health insurers or who treat or seek to treat patients in hospitals, and who are not exempt from the board certification burdens of ABMS and its above-listed Specialty Boards." [49] at 14 ¶ 72.

ABMS now moves to dismiss the amended complaint. [51].

## DISCUSSION

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### I. Sherman Act Section 1 (Count 1)

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim for a Section 1 violation, the complaint must plausibly allege: (1) a contract, combination, or conspiracy (*i.e.*, an agreement), (2) a resultant unreasonable restraint of trade in a relevant market, and (3) an accompanying injury. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

As discussed above, in dismissing the initial complaint, Judge Wood held that the complaint did not plausibly allege the second or third elements of a Section 1 claim: an unreasonable restraint and antitrust injury. [48]. AAPS then filed the operative amended complaint, again alleging that ABMS violated Section 1. In the motion to dismiss, ABMS argues that the amended complaint did not cure the deficiencies as to these two elements.

#### A. Unreasonable restraint of trade in a relevant market

On the second element, the complaint must plausibly allege an unreasonable restraint of trade in a relevant market. The parties dispute whether any alleged restraint was unreasonable. ABMS also contends that the complaint does not define a relevant market.

"[T]he determination of whether a restraint is unreasonable must focus on the competitive effects of challenged behavior relative to such alternatives as its

5

abandonment or a less restrictive substitute." *Agnew*, 683 F.3d at 335 (quotation marks and citations omitted). Courts use three categories of analysis to determine whether actions have anticompetitive effects: *per se*, quick-look, and rule of reason, "though the methods often blend together." *Id.* "All of these methods of analysis are meant to answer the same question: whether or not the challenged restraint enhances competition." *Id.* (citations and internal quotation marks omitted). AAPS argues ABMS's conduct is unlawful under both the *per se* and rule of reason frameworks.

Here, AAPS appears to allege two different types of restraints: (1) unlawful tying arrangements and (2) unlawful agreements to require MOC. The court addresses each type of restraint below.

1. **Tying**

AAPS alleges that "ABMS's collusion with health insurers and hospitals" is an unlawful *per se* tying of "products and services." [49] at 6 ¶ 17; *see also* [49] at 16–17 ¶¶ 86–88.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11–12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020). "In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected. . . . In addition, . . . an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in." *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006) (citations omitted) (quoting *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985)).

AAPS does not allege facts that suggest a tying arrangement between two distinct products or services. AAPS cites *Talone v. Am. Ost. Ass'n*, No. 16-cv-04644, 2017 WL 2539394 (D.N.J. June 12, 2017). [55] at 8. But *Talone* involved the tying of the American Osteopathic Association's ("AOA") certification and AOA membership, *i.e.*, AOA's requiring osteopathic physicians, who were certified by AOA, to purchase AOA membership to maintain their certification. *Id.* at *5.

Here, unlike in *Talone*, the nature of the tying arrangement is not entirely clear. AAPS alleges that "ABMS's collusion with health insurers and hospitals" is an unlawful *per se* tying of "products and services." [49] at 6 ¶ 17; *see also* [49] at 16–17 ¶¶ 86–88. AAPS's response brief states that "ABMS induces insurance companies and hospitals to require or 'tie' ABMS MOC® as a condition of being in-network or on staff." [55] at 7. Later the response describes the "tying of certification" without clearly identifying to what it is tied. [55] at 8. No further allegations elaborate on the tying arrangement. It is unclear which products or services are "tying" or "tied."

The complaint may be alleging that ABMS, insurers, and hospitals are colluding to tie a product unwanted by physicians (MOC) to the provision of "services" wanted by physicians (in-network status and / or hospital privileges, if these can even be considered "services"), but if so, the complaint does not allege such a theory with sufficient clarity for the court to evaluate the claim, nor do the briefs address such a theory. *See Ellison v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. 16-cv-08441, 2020 WL 1183345, at *10 (D.N.J. Mar. 12, 2020) ("A tying arrangement must be viewed in light of the power wielded by the purported seller to force a consumer to buy other products it did not want, or did not want on those terms. . . . There are no facts tending to demonstrate that *ABOS*—the defendant here—is conditioning staff privileges on participation in its certification program, or profiting therefrom. The theory, then, must be some highly attenuated one, for which the necessary facts are not pled.") (emphasis in original). The allegations do not plausibly suggest an arrangement to tie MOC and admitting privileges and / or in-network status between ABMS and a nationwide group of hospitals and / or insurance companies. Nor does the complaint attempt to resolve the "difficulties in treating hospital staff status as a tied 'product' sold in a market." *Id.*

Because the complaint does not sufficiently allege a tying arrangement between two products or services, a tying claim cannot proceed.

    2.    **MOC requirements**

Next, AAPS alleges that ABMS, the specialty boards, health insurers, and hospitals have agreed to require physicians to purchase MOC. The question is whether the complaint has plausibly alleged an unreasonable restraint of trade under the *per se* rule or the rule of reason.

    a.    ***Per se* rule**

Under the *per se* rule, certain restraints may be deemed unreasonable without any inquiry into the relevant market context. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984). "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market

7

forces at work . . . . Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . . or to divide markets . . . ." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). "Resort to *per se* rules is confined to restraints, like those mentioned, that would always or almost always tend to restrict competition and decrease output. . . . To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects, . . . and lack . . . any redeeming virtue." *Id.* (citations and internal quotation marks omitted). "As a consequence, the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason," rather than "in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 886–87 (citations and internal quotation marks omitted); *see also Agnew*, 683 F.3d at 336.

As Judge Wood held in dismissing the prior complaint: "AAPS has not alleged any type of agreement suggesting a *per se* unlawful restraint, such as a horizontal agreement among competitors to fix prices or to divide markets." [48] at 7. The allegations in the amended complaint do not solve this problem. There is no basis to infer that the type of restraint alleged here is one that tends to restrict competition and decrease output in all or almost all instances, nor does AAPS's response brief argue there is one. *See BCB Anesthesia Care Ltd. v. Passavant Mem. Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994) ("there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all"); *Ellison*, 2020 WL 1183345, at *7 (regarding a hospital's requiring physicians to be certified, "[i]t cannot be said that such a practice has no legitimate purpose, and can only be aimed at restraining trade"; "a hospital's requirement that physicians meet certain qualifications will rarely if ever" be "found to be *per se* unreasonable"). Nor is there any indication that courts have had considerable experience with similar alleged restraints such that a *per se* analysis would be appropriate for the alleged agreements here.

  b. **Rule of reason**

Turning to the rule of reason, under that analysis, "the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. "As a threshold matter, a plaintiff must show that the defendant has market power—that

is, the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Id.*

The amended complaint does not sufficiently allege a relevant market or market power within that market.

As to the relevant market, the plaintiff's "threshold burden" under the ruleof reason "involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Agnew*, 683 F.3d at 337. "Because legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law, . . . courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market. Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition. . . . Thus, the relevant market is defined as the area of effective competition. Typically this is the arena within which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citations, internal quotation marks, brackets, and footnote omitted). "The antitrust statutes require a pragmatic and factual approach to defining the geographic market. . . . The market must correspond to the commercial realities of the industry." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (citations and internal quotation marks omitted); *see also 42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).

The original complaint alleged that the relevant market consisted of "medical care provided by physicians to hospitalized patients." [1] at 4 ¶ 8. The amended complaint defines the relevant market as follows: "The relevant service market consists of medical care provided by physicians who are subject to MOC, and who are either in-network, or seek to be in-network, with health insurers, or treat or seek to treat hospitalized patients." [49] at 13 ¶ 67. "The relevant geographic market is nationwide except for States that have generally prohibited MOC requirements, as Texas has." [49] at 13 ¶ 68.

The market definition in the amended complaint does not plausibly "correspond to the commercial realities" of the relevant industry. *Sharif Pharmacy*, 950 F.3d at 917. "It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers. Plaintiffs err, however, when they try to turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601 (8th Cir. 2009) (affirming dismissal for failure to plead plausible relevant market); *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (same).

Again, the relevant market is "the area of effective competition," which is generally the "arena within which significant substitution in consumption or production occurs." *Ohio*, 138 S. Ct. at 2285 (citations and internal quotation marks omitted). The amended complaint does not allege facts that plausibly suggest that consumers distinguish between physicians who are subject to MOC and those who are not. Likewise for the definition's geographic scope, which is "nationwide except for States that have generally prohibited MOC requirements, as Texas has." [49] at 13 ¶ 68. "For highly exotic or highly elective hospital treatment, patients will sometimes travel long distances, of course. But for the most part hospital services are local. People want to be hospitalized near their families and homes, in hospitals in which their own—local—doctors have hospital privileges." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284–85 (7th Cir. 1990).[3] The same is true of the outpatient care encompassed in the proposed market definition. Further, even if consumers were willing to travel across the country for substitute medical care, the complaint offers no reason why they would only go to states that allow MOC requirements. The complaint provides no reason why these limitations accurately reflect commercial realities.

Even if this definition plausibly described a market, the complaint does not plausibly suggest market power in that market. "Substantial market power is an essential ingredient of every antitrust case under the Rule of Reason." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), *as amended on denial of reh'g* (Jan. 11, 1995).

Even assuming that it would be appropriate to consider the market power of not just ABMS but also the specialty boards, health insurers, and hospitals, in order to have market power in the relevant market, ABMS and the specialty boards, health insurers, and hospitals would need to be able to raise the prices of physician care—effectively in a nationwide market—without going out of business. The amended complaint asserts, without elaboration, that health insurers and hospitals themselves have sufficient market power. [49] at 6–7 ¶¶ 18, 25; *id.* at 16 ¶ 86. AAPS further states in its brief:

> There is no lack of market power by any entity on Defendant's side of this case. The aggregate market power of the American Hospital Association and the Blue Cross and Blue Shield Association, through their members, cannot seriously be doubted. Each hospital almost always has market power in its community, as do insurance companies within their respective States. Through their trade associations they

---

[3] AAPS argues that "[e]ach hospital almost always has market power in its community, as do insurance companies within their respective States." [55] at 9–10. Even if AAPS could proceed on a theory that ABMS conspired with entities nationwide to restrain trade in most or all localized markets for physician care, this conclusory statement about market power is far too general to support AAPS's proposed market definition.

10

> have market power in the relevant market of medical services provided at hospitals or through insurance networks.

[55] at 9–10. AAPS does not elaborate on these conclusory allegations, nor does AAPS provide any facts substantiating the alleged market share belonging to the American Hospital Association, the Blue Cross and Blue Shield Association, or any other participant in the alleged market. Without some assertion of the relevant market size and the power wielded by the alleged co-conspirators, there are no facts to support ABMS's alleged market power (with or without the agreements alleged in the complaint). *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008) ("[U]nder the pleading regime created by [*Twombly*], the plaintiffs' naked assertion of Marathon's "appreciable economic power"—an empty phrase—cannot save the complaint.").

Because the complaint does not sufficiently allege either a relevant market or market power within that market, it does not state a Section 1 claim under the rule of reason.

### B. Agreement

The parties dispute not only whether any restraint was unreasonable (discussed above) but also whether ABMS imposed *any* restraint at all. The dispute concerns the second element of a Section 1 claim (restraint), but AAPS's arguments on the issue undermine the first element (agreement).

Judge Wood held in dismissing the original complaint: "AAPS has alleged no facts showing that ABMS has the ability to control hospitals nationwide or coerce hospitals to force physicians to participate in the MOC program" and "AAPS has not pleaded facts plausibly suggesting that ABMS has authority over any insurance companies sufficient to cause a restraint of trade." [48] at 8, 9 n.2. This is true of the amended complaint as well; there are no facts that plausibly suggest ABMS possesses authority or control over hospitals or insurers.

Consistent with Judge Wood's holding, ABMS argues in the motion to dismiss that ABMS lacks control or authority over insurers and hospitals and thus could not have restrained trade. [52] at 8–10; [56] at 6–7. *See Schachar v. American Academy of Ophthalmology*, 870 F.2d 397, 399 (7th Cir. 1989) (no restraint where defendant had "no authority over hospitals, insurers, state medical societies or licensing boards"); *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 977 F.2d 585, at *7 (7th Cir. 1992); *Patel v. American Board of Psychiatry & Neurology, Inc.*, No. 89-cv-01751, 1989 WL 152816, at *3 (N.D. Ill. Nov. 21, 1989); *Oral Implantology*, 390 F. Supp. 3d at 906 ("If the certifying entity lacks the power to prevent (or has not

11

prevented) the professional from practicing without a certification, there has been no antitrust violation").[4]

In response to this argument, AAPS clarifies that it is alleging that the specialty boards, hospitals, and health insurers are co-conspirators, and disclaims any allegation that ABMS exerted control over those entities. *See* AAPS Resp., [55] at 5 ("AAPS does not allege that ABMS has forced insurance companies or hospitals to do anything, but rather that ABMS has conspired and colluded with insurance companies and hospitals"). The amended complaint alleges: "ABMS has conspired with health insurers and hospitals to require physicians to purchase the ABMS MOC® product as a condition of being in health plan networks or having medical staff privileges, respectively." [49] at 6 ¶ 16. With the restraint of trade framed this way, the fact that ABMS lacks authority or control over its coconspirators does not itself decide whether the alleged coconspirators together restrained trade.

However, as ABMS points out in its reply brief, this new framing only works if AAPS has plausibly alleged such a conspiracy. *See* [56] at 6–7.[5] Indeed, Section 1 does not prohibit all unreasonable restraints on trade, but only those effected by a contract, combination, or conspiracy, in other words, by an agreement. *Twombly*, 550 U.S. at 553. To allege a conspiracy or agreement, AAPS must allege that ABMS "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "That is, the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Omnicare*, 629 F.3d at 706 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).

The allegations in the amended complaint do not plausibly allege a nationwide agreement between ABMS and an untold number of hospitals and health insurers. Yet again, the problem stems from the proposed market definition. As noted above, that definition is as follows: "The relevant service market consists of medical care provided by physicians who are subject to MOC, and who are either in-network, or seek to be in-network, with health insurers, or treat or seek to treat hospitalized patients." [49] at 13 ¶ 67. "The relevant geographic market is nationwide except for States that have generally prohibited MOC requirements,

---

[4] The opinion in *Oral Implantology* was issued after the parties finished briefing this motion but involves a similar analysis about the lack of restraint in the professional certification context.

[5] ABMS did not directly challenge the allegations supporting the alleged agreement until its reply brief. However, AAPS addressed the alleged conspiracy in its response brief, so it is appropriate to reach the issue. *See Carver v. Nall*, 172 F.3d 513, 515 (7th Cir. 1999) ("specifically address[ing]" point in response brief not raised in opening constitutes waiver of forfeiture argument).

12

as Texas has." [49] at 13 ¶ 68. The proposed market appears to encompass a substantial number, if not the vast majority, of physicians nationwide (with the exceptions of Texas, Oklahoma, and perhaps other unspecified states) who are subject to MOC and who treat patients in typical, common settings, such as hospitals and clinics. The sweeping breadth of the alleged market and the sheer number of hospitals and insurance companies that would have to be involved make the alleged agreement implausible. *See Ellison*, 2020 WL 1183345, at *8 (illegal agreement between American Board of Orthopaedic Surgery and "large collection of New Jersey hospitals" implausible).

The other relevant allegations in the amended complaint do not make the claim plausible. Some allegations describe the widespread adoption by insurers and hospitals of MOC as a requirement for physicians. The complaint alleges that "Blue Cross and Blue Shield-affiliated health plans in multiple states," such as Blue Cross and Blue Shield of Massachusetts and Independence Blue Cross of Pennsylvania, "impose a requirement that physicians purchase and participate in ABMS MOC® as a condition of participating in their health insurance networks." [49] at 6–7 ¶¶ 19–22. The complaint further alleges that "[a]pproximately 80% of hospitals now require certification by ABMS as a condition for physicians to be on the medical staff," [49] at 8 ¶ 31, and "[m]ost health insurers, particularly in metropolitan areas, require that physicians purchase and comply with Defendant's ABMS MOC® product as a condition of being in-network with the insurer," [49] at 7 ¶ 24. Additionally, the AHA (a hospital trade association) "is an associate member of Defendant ABMS and agrees with it to impose ABMS MOC® on physicians." [49] at 7 ¶ 26. However, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556; *see also Ellison*, 2020 WL 1183345, at *7–8 ("Without more, the mere fact that certain hospitals require Board Certification for admitting privileges combined with a bare assertion that hospitals conspired with ABOS is not a sufficient allegation of an unlawful agreement. . . . Nothing in this complaint goes beyond an allegation that the hospitals chose to require certification by an outside organization, ABOS.").

Other than the allegations of widespread adoption of MOC as a physician requirement (which are not sufficient as discussed above), there are no plausible factual allegations about how ABMS entered into an arrangement with hospitals and insurers throughout the country, nor why it would make sense for these diverse entities to do so. ABMS allegedly "publicly admits that it encouraged and obtained a commitment by the Blue Cross and Blue Shield Association ('BCBSA') to require physicians to purchase and participate in ABMS MOC® as a condition of physicians being in-network with health insurance plans," causing "Blue Cross and Blue Shield-affiliated health plans in multiple states," such as Blue Cross and Blue Shield of Massachusetts and Independence Blue Cross of Pennsylvania, to impose such a requirement. [49] at 6 ¶¶ 19–22. And ABMS has referenced its "campaign to induce hospitals to impose the ABMS MOC® product as a condition of holding medical staff privileges." [49] at 7–8 ¶ 27. Encouraging and campaigning for MOC

13

adoption are not the same as a conspiracy, and nothing suggests BCBSA did not independently decide to require MOC. *See Ellison*, 2020 WL 1183345, at *8 ("These vague allegations that ABMS influenced or pressured hospitals into requiring board certification actually suggest just the opposite. Lacking any actual agreement with hospitals, ABMS engaged in public marketing efforts in an attempt to expand the reach of its programs."). And even if these allegations plausibly suggested an agreement with Blue Cross and Blue Shield-affiliated health plans in particular (which they do not), they still would not plausibly suggest a nationwide agreement between insurers, hospitals, and ABMS. The complaint also offers no explanation for why hospitals and insurers would enter into an agreement that allegedly reduces the output and increases the cost of physician care just to benefit ABMS.

Moreover, there is an alternative explanation for hospitals and insurers to require MOC aside from an unlawful agreement—that hospitals and insurers independently decided MOC provides useful information. *See Ellison*, 2020 WL 1183345, at *8 ("the 2AC asserts nothing to suggest that this large collection of New Jersey hospitals decided to require board certification as a prerequisite to medical staff privileges based on an illicit agreement, rather than as the result of their own independent calculation that this requirement would improve the quality of care or make them more competitive in attracting patients"). In light of this alternative, the allegations do not plausibly suggest an agreement to restrain trade. *See Twombly*, 550 U.S. at 567–69; *Iqbal*, 556 U.S. at 682. At best, the complaint alleges facts that are "merely consistent with" a conspiracy, and that is not enough. *Twombly*, 550 U.S. at 557; *see also Ellison*, 2020 WL 1183345, at *7–8.

For these reasons, to the extent the amended complaint has alleged a restraint on trade, it has not alleged one effected by a conspiracy.

Since the amended complaint plausibly alleges neither an unreasonable restraint of trade in a relevant market nor an agreement in the first place, the court need not address whether the complaint plausibly alleges an antitrust injury. Count 1 is dismissed.

## II. Illinois Uniform Deceptive Trade Practices Act (Count 2)

In the original complaint, AAPS asserted a negligent misrepresentation claim. Judge Wood granted ABMS's motion to dismiss that claim. *See* [48] at 12–13.

Instead of negligent misrepresentation, Count 2 of the amended complaint asserts a claim under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. [49] at 18–22 ¶¶ 97–121.

14

The Act provides as relevant:

(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact . . . .

815 ILCS 510/2(a)(8); *see ATC Healthcare Services, Inc. v. RCM Technology*, 192 F. Supp. 3d 943, 952 (N.D. Ill. 2016); *Menasha Corp. v. News Am. Mktg. In–Store, Inc.*, 238 F. Supp. 2d 1024, 1035 (N.D. Ill. 2003). A plaintiff must identify some form of communication to the public regarding the plaintiff's services that is "false, misleading, or deceptive." *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997); *see also Associated Underwriters of America Agency, Inc. v. McCarthy*, 356 Ill. App. 3d 1010, 1021, 826 N.E.2d 1160, 1169 (2005) ("In its complaint and on appeal, plaintiff is unable to point to any *specific* communication by defendants that disparaged plaintiff's business.") (emphasis added).

In holding that the complaint did not state a negligent misrepresentation claim, Judge Wood held that many of ABMS's representations were "simply true statements." [48] at 12–13. Abandoning its previous argument that ABMS made *false* statements of fact, AAPS now contends that ABMS's representations are misleading. AAPS focuses its argument on two words: "board" and "requirements." Specifically, AAPS argues that "ABMS calling itself a 'Board' while referring to its arbitrary conditions as 'requirements' is misleading and unfair." [55] at 14. "Board," according to AAPS, misleadingly implies that ABMS "has some authority akin to an official state medical board, when in fact Defendant and its co-conspirators lack any official legitimacy." [49] at 20 ¶ 110. The amended complaint does not plausibly allege how an ordinary person would infer "official state authority" upon hearing "board." Boards come in a variety of forms and are not always official state government entities. The argument with respect to "requirements" fares no better. Under this theory, the use of the word "requirements" misleadingly connotes a "legal, governmental, or academic requirement or oversight." [49] at 18 ¶ 102. The amended complaint does not plausibly allege that "requirements" implies such oversight, particularly when many "requirements" without a formal legal, governmental, or academic mandate exist.

Finally, AAPS's general allegations about ABMS, *e.g.*, [49] at 19 ¶¶ 105, 107, do not plausibly allege communications about an identifiable good or service. *See Associated Underwriters*, 826 N.E.2d at 1169; *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 386 F. Supp. 3d 926, 939 (N.D. Ill. 2019) ("under the UDTPA a plaintiff must allege that defendant published untrue or misleading statements that disparaged the plaintiff's goods or services") (citation omitted). Count 2 is dismissed.

15

## CONCLUSION

The motion to dismiss [51] is granted. The amended complaint is dismissed with prejudice.


Date: September 22, 2020                                  /s/ Martha M. Pacold